## JAMES V. ADLEY
vs.
## CITY OF BRIDGEPORT, ET AL.

Superior Court        Fairfield County        File #50124

Present: Hon. CARL FOSTER, Judge.

John T. Cullinan,            Attorney for the Plaintiff.

Harry Schwartz,            Attorney for the Defendant.

MEMORANDUM FILED MARCH 2, 1936.

FOSTER, J. In this case James V. Adley, an inhabitant and taxpayer of the City of Bridgeport, complains that the Department of Public Purchases of the City of Bridgeport, after advertising for bids for 14 motor truck chassis, awarded the contract to the Mack Motor Truck Company, who bid $48,790., instead of to The Adley Company, Inc., who bid $31,355., which is claimed by the plaintiff to have been the lowest of all of the bids submitted.

It is to be borne in mind throughout the consideration of the case that the plaintiff is James V. Adley, a resident and taxpayer of the City of Bridgeport, and not The Adley Co., Inc., or any other company who failed to secure the award of the contract.

We must have clearly before us the facts of the case in detail.

There was presented to me, as a Judge of the Superior Court, a writ and complaint returnable on the first Tuesday of April, 1936, wherein James V. Adley, a resident and taxpayer of the City of Bridgeport, complained that the Department of Public Purchases, acting for the City of Bridgeport, was about to enter into a contract contrary to law and the ordinances of the City of Bridgeport, and there was also presented a petition, in due and legal form, for a temporary injunction. Upon an ex parte hearing, I, as a Judge of the Superior Court, signed the temporary injunction for which prayer was made.

Now come before me, a Judge of the Superior Court, the defendants City of Bridgeport, Fred Schwarzkopf, Rockwell J. Larrabee, Albert W. Miller and the Department of Public Purchases of the City of Bridgeport and move that the temporary injunction be dissolved and vacated. Both plaintiff and defendants have presented their witnesses and presented

their claims of law and have been heard at length.

The following are parts of the ordinances of the City of Bridgeport:

"Section 96. All contracts to be made or let for work to be done, or for supplies to be furnished to the city, including purchases of every description, shall, except in cases hereinafter stated, be publicly advertised for the purpose of receiving bids upon the same in one or more of the local daily papers, and if deemed advisable, in other papers provided that the several parts of the work necessary to be done, or supplies to be furnished in connection with said contract, shall together involve the expenditure of more than $200., and the bids received upon such public advertisement shall be publicly opened at a hearing of the Common Council or of the board, officer or committee authorized to make such contract, the date of such hearing being named in such public advertisement and the contract shall be awarded by the Common Council, or such board, officer, or committee, to the lowest responsible bidder.

Section 9. The ordinance entitled "An Ordinance relative to City Contracts", adopted May 21, 1906, as amended, is hereby made a part hereof, and is applicable to said Department of Public Purchases as created by said Charter amendment mentioned in Section One hereof; except that said Department shall have the discretion and power to reject all bids."

On February 11th, 1936, the following notice was publicly advertised in a daily paper of the City of Bridgeport:

"NOTICE

Sealed bids will be received by the Department of Public Purchases until 2 p. m., Monday, February 17, 1936, on 14 truck chassis for refuse collecting, according to specifications available at this office. These chassis are to be of 8,000 lb. minimum weight instead of 8,500 lb. minimum weight as previously advertised.

The right to reject any or all bids is reserved.

DEPARTMENT OF PUBLIC PURCHASES,<br>172 State Street."

In accordance with the notice, there was delivered to proposed bidders at the office of the Department of Public Purchases, upon request, a document denominated "Specifi-

cations", but such document was, in fact, more in the nature of a questionnaire, or list of directions or instructions to bidders. Bids for 14 motor truck chassis, all being set forth in much detail, were received by the Department of Public Purchases, and, on February 17th, 1936, a meeting of such Department was held, a portion of the minutes of which are as follows:

"Meeting of the Department of Public Purchases, Monday, February 17, 1936. Present: Fred D. Schwarzkopf, president; Rockwell J. Larrabee, Albert W. Miller.

Bids were opened on furnishing fourteen truck chassis. The bids, each accompanied by a certified check for $1,000.00, in accordance with the specifications, were as follows:

Mack Motor Truck Co.—Model BF, six cylinder, open cab, $49,140.00; same model, closed cab, $50,890.00; Model AB, four cylinder, open cab, $48,790.00; same model, closed cab, $50,540.00.

Adley Co.—Model 718A White, $35,996.50; Model 712AX White, $31,355.00.

Autocar Trucks—Model RH, $2,664.97 each; $37,309.58.

Blue Ribbon Garage—Model K-60, 3-7 ton chassis, $1,975.00 each; $27,650.00.

International Harvester Co.—Model C-60 International, $2,607.50 each for dual reduction rear axle, less $100.00 each for bevel drive avle.

J. L. Carpenter Co.—Federal, $35,227.00.

General Motor Service & Truck Co.—Model T46D GMC, $36,330.00.

On the motion of Mr. Larrabee, seconded by Mr. Miller, President Schwarzkopf was empowered to study the bids and specifications and make the award after consultation with Mayor McLevy and Director of Public Works Brewster."

Mayor McLevy had had for many months in mind the collection of ashes and garbage by the City and had made

extensive special personal investigation to determine what kind of truck would best and most economically serve the interests of the city.

In making such investigation he had visited towns and cities in the States of New York, New Jersey and Connecticut. Director of Public Works Brewster had had much personal and practical experience with different kinds of motor trucks and had visited plants in Bridgeport of various bidders. Mr. Wellington, one of those with whom President Schwarzkopf consulted, is a mechanic of many years' experience, is President of the Board of Fire Commissioners of Bridgeport and had made special investigation of various kinds of trucks.

On February 21st, 1936, the Department of Public Purchases held a meeting, a portion of the minutes of which is as follows:

"Meeting of the Department of Public Purchases, February 21, 1936, Present Fred D. Schwarzkopf, President; Rockwell J. Larrabee, Albert W. Miller.

Reporting at some length on the truck chassis for refuse collecting, President Schwarzkopf stated that he had checked responses of the bidders to the specifications and questionnaire and had invited all of them to have their chassis at the Municipal Garage on the afternoon of February 20, for inspection. There he and others had inspected them and talked with representatives of the bidding companies.

All of the chassis were considered by him to be good for certain usages, he said, but he was impressed most by the four-cylinder, chain-driven Mack because of the absence of rear-end mechanism and the belief that it would consume less gas than a six-cylinder machine. Gas consumption he regarded as an important factor in view of the peculiar use to which the trucks were to be put—stopping approximately every 50 feet and idling for some moments. In the case of chain-driven Macks, he stated, chains could be replaced without delay for $30.00, whereas repairs to rear-ends of shaft-driven machines would entail considerably more expense, would tie up trucks and seriously embarrass the collection system.

The City's experience with Macks has been happy he

said, some of those in service being 17 years old and still in good running condition. He was further impressed, he explained, with the fact that the Mossup Trucking Company has been using Mack trucks for the same work and has found them so satisfactory as to warrant purchasing more of the same kind.

His consultation with various persons present at the demonstration and in the Mayor's office following showed an overwhelming opinion in favor of the Mack as being the best value for the purpose, he continued. He was convinced that the Mack Company was in a position to furnish the best service facilities among all the competing trucks and also felt that the company was, from the City's angle, the most responsible firm among the bidders. In his opinion the City would be getting better value for its money in buying Macks, and, by so doing would enjoy an advantageous discount on all Mack parts, both for City trucks now in use and those proposed for refuse collection. He said he felt that purchase of the Macks would serve the best interests of the City and that he had accepted the bid of $48,790. for 14 four-cylinder open cab Macks. The board, on motion of Mr. Larrabee, seconded by Mr. Miller, ratified this action."

Upon this state of facts this resident and taxpayer claims that the action of Mr. Schwarzkopf and the action of the Department of Public Purchases were illegal and if carried out, will injure him beyond legal redress.

The ordinances above quoted do not require that the Department of Public Purchases shall draft or submit to proposed bidders specifications of proposed purchases. In the present instance the Department did, in fact, submit to bidders the document to which reference is above made denominated "Specifications" and, in this document and in the advertisement above quoted, the Department of Public Purchases reserved the right to reject any and all bids.

In effect, the Department of Public Purchases rejected all bids except that made by the Mack Motor Truck Company.

Not only was the right to reject any and all bids reserved, but the Department of Public Purchases had the inherent right to do this by virtue of the powers conferred upon it

by ordinance. We must consider the nature of the purchase proposed to be made. It was not proposed to purchase a specific well defined article. It was proposed to purchase an instrumentality that would accomplish work known to be heavy, but the exact character of which was variable. The chassis would be required to carry heavy bodies and heavy loads; they would, when being loaded with ashes and garbage, be required to stop and start with frequency and within short spaces; they would be required to travel over all sorts of roads, hard, soft, slippery and over the sometimes soft, uneven ground of dumping areas where no road exists. If one chassis would accomplish this work and another costing less would not do the work, the City should not be deprived of the better chassis by reason of the difference in price. The one costing less might be really the more expensive. In awarding the contract it was the duty of the Department of Public Purchases to determine who was the lowest bidder, but, in arriving at such determination, it was bound to consider not price alone, but the character of the article, in view of the use that would be required of it; and when we say "character of the article", we may consider its probable durability, probable deprecia-tion and intrinsic value at the time of purchase, with reason-able anticipation of repairing or servicing and cost of the latter. As illustrations in the present instance, it was proper to consider whether the chassis were chain-driven or shaft-driven; whether the engines were four cylinder or six cylinder.

Under the ordinances it was the duty of the Department of Public Purchases to consider not only which bid was the lowest, but also whether the bidder was responsible. Respon-sibility involves numerous elements. A bidder may have ample money but little of required facility to perform a contract.

In this case important elements may be the size and loca-tion of local garage or repair shop, the present supply of parts for immediate replacement, the proven skill and effi-ciency of workmen in such shops and other material facts. There are many cases that support the view we here take.

Suffice it to quote at this point from a decision of the Supreme Court of Errors of this State:

"Another line of decisions rests squarely upon the

proposition that the requirement for bids goes no further than the purpose intended to be served and does not reflect any legislative intent to forbid the acquisition by the city of such articles as in the judgment of the proper municipal authorities, will best serve its needs whether obtainable from several sources or from but one source; that the intent could not have been to require the impossible. The position taken in these decisions accords with our own views as to a sound public policy.

The intent of the lawmakers is the soul of the statute, and the search for this intent we have held to be the guiding star for the court. It must prevail over the literal sense and the precise letter of the language of the statute.

When one construction leads to public mischief which another construction will avoid, the latter is to be favored unless the terms of the statute absolutely forbid.

A statute should be construed, having in view the nature and reason of the remedy and the object of the statute, in order to give effect to the legislative intent."

**The State ex rel Stamford vs. Board of Purchase and Supplies, 111 Conn. 147, 159, 161.**

It is in evidence and I find, as a fact, that the Department of Public Purchases found as a fact that the Mack Motor Truck Company was the lowest responsible bidder for the chassis proposed to be purchased. This being so, the Court, or a Judge thereof, will not disturb such finding of the Department of Public Purchases.

"In the absence of fraud, corruption or abuse of discretion, the determination of the proper officers in making an award will not be disturbed by the courts . . . . So where a board is authorized to discriminate between bidders, and there is no abuse of discretion, the court will not interfere with the discretion of municipal authorities in awarding the contract nor with the performance of the contract, unless its illegality is clearly established. The exercise of discretion to accept or reject bids will only be controlled by the courts when necessary to prevent fraud, injustice or the violation of a trust."

3 McQuillan on Municipal Corporations, (2nd E.) Sec. 1340.

On February 17th, 1936, the Department of Public Purchases voted to empower President Schwarzkopf to make the award after consultation with Mayor McLevy and Director of Public Works Brewster. In this action the Department of Public Purchases erred. It had no legal right to empower its President to make the award. But on February 21st, 1936, the Department of Public Purchases at its meeting passed a vote ratifying the action of its President; and it thereby complied with the law in full spirit. None of the members of this Department are mechanical experts or engineers. Such information as they acquired necessarily had to come from those specially informed. Mr. Schwarzkopf made a thorough investigation of the question and notified the Mack Motor Truck Company that the contract would be awarded to it. He then immediately reported to a full meeting of the Department and his acts were ratified. The Department of Public Purchases by its action on February 21st, in effect actually awarded the contract to the Mack Motor Truck Company. Here was more than a ratification of the act of Mr. Schwarzkopf in awarding the contract. The Department of Public Purchases adopted the investigation of Mr. Schwarzkopf and his findings as its own and then proceeded to award the contract to the Mack Motor Truck Company by ratification of his act in that regard.

We have then the situation that the department had the legal right to find as a fact that the Mack Motor Truck Company was the lowest responsible bidder; that such fact was found upon a careful investigation and report of the President of the Department; that the President told the Mack Motor Truck Company over the telephone that they would have the contract( such was the testimony); that almost immediately he reported to a regular meeting of the Board his recommendation and his reasons therefor; that the Department of Public Purchases unanimously then ratified and made its own the investigations of its President and his so-called "award" of the contract. With such act of the Department of Public Purchases, the Court, or a Judge thereof, cannot interfere by injunction.

The prominent question of fact in this case is that of

seven bids received, the lowest was $31,355., while the high-est was $48,790., and that it is found by the Department of Public Purchases as a fact that the Mack Motor Company in making the bid of $48,790. is the lowest responsible bidder.

The action of the Department of Public Purchases left much to be explained. It gave rise to public suspicion of wrong however groundless such suspicion. In this case I find as a fact that in the awarding of this contract by the Department of Public Purchases there was no collusion of any member of the Department, or any other officer of the City, with any bidder, nor was there any fraud, favortism, corruption or improvidence, nor was there charge of any.

"The provision for bids is obviously based upon the sound view of preventing favortism, corruption and im-providence and other evils which might flow from the award of municipal contracts, and it should be so con-strued as to effectuate as far as possible the legislative intent in that regard. Whether this can be done under such circumstances as here presented, without destroying the power of the common council and other departments of the city government to meet the city's needs, raises a question of serious import to every municipality in the State . . . ."

The State ex rel Stamford vs. Board of Purchases and Supplies, supra.

Where definite specifications are possible, the figures speak for themselves and the use of discretion by public officers is reduced to a minimum. The use of such specifications is sometimes impossible but, when used, public officers are pro-tected and the public is more at ease.

The motion that the temporary injunction be dissolved and vacated is granted, and the temporary injunction is dis-solved and vacated.